Criminal prosecution upon a bill of indictment charging that defendant "feloniously, willfully, and of his malice aforethought, did kill and murder Felix Tant," etc.
Defendant pleaded not guilty. And "the Solicitor announced in open court that he would not ask for a verdict greater than second degree or manslaughter."
This indictment, as shown by the record, grew out of a collision on Sunday afternoon, 12 September, 1948, between an automobile operated by defendant, traveling west on the highway leading from Polly's *Page 376 
Kitchen, a store operated by one Theodore Medlin, toward Wake Forest, in which two others, Tink Hodge and Howard Harris, were riding, and a motorcycle, just acquired from Theodore Medlin, and operated by Felix Tant, traveling east on same highway, in which collision Tant was killed. The road runs east and west.
The State offered in chief no eyewitnesses to the collision. However, the evidence in chief, offered by the State, tends to show these facts: The accident occurred after noon on Sunday, at a point near the top and on the east side of a hill. Defendant's automobile was going upgrade, and the motorcycle was "coming down on incline." It was not steep at all for either vehicle. The wreck happened, as stated by one witness, about 90 feet down hill, and another stated "Spivey lacked about 75 or 100 yards getting to the crest." The hard-surfacing of the road was 18 feet in width. After the collision, defendant's automobile was off the highway on the left-hand side going to Wake Forest, that is, the south side, part in the ditch and part on the bank. The right wheel was in the ditch, and the left on the bank. The front of the automobile did not go directly in the bank. It whipped up the bank, headed to the left. It was 30 yards from "the cars to where they hit" — and it was 15 or 20 steps to the crest of the hill from "the cars going west."
The motorcycle of deceased, Felix Tant, was in front of the automobile to the left. It had hit the left part of the grill — about halfway between the radiator and the light.
The wheels of the automobile were standing up inflated. The brake "peddle" was not working. The windshield was cracked all over, the top was dented on the driver's side, the front was torn up and the steering wheel was dented. The motorcycle was "torn all to pieces."
The body of Felix Tant, stripped of clothes, was lying at the back bumper of the automobile on the left, and south side of the road, going toward Wake Forest. The neck was broken, skull fractured, both arms broken above the elbow, and the left leg broken above and below the knee. There was a gash, 7 inches long, and "nearly to the hollow" across the stomach, and several cuts and scratches on the face.
Marks on the highway were described by some of the witnesses: One stated that he saw one mark 12 or 14 feet up the highway and 2 feet from the south side of the road; and that it looked as if a part of "the motorcycle had drug" along the highway, 12 or 14 feet from "the back of the car where the boy was lying." Another testified: "The only marks that I saw on the highway were 18 inches or 2 feet from the left of the highway where the car hit the motorcycle on the left going toward Wake Forest, that is the direction in which the car was traveling. It looked like something off the motorcycle drug up the highway and continued up to where the motorcycle was." And a third, a State Highway Patrolman, *Page 377 
said: "My investigation of the wreck showed a mark on the road down toward Bunn from the car — some 30 yards from the body, on the south side of the highway — approximately 2 feet from the dirt — there was one place in the road where the pavement was scraped out, which was the only place along the highway that could have possibly been the point of impact . . . The marks I found were 30 feet east of the body. It was on the left-hand side of the road going toward Wake Forest. I didn't see any marks on the right-hand side of the road."
And one of the State's witnesses said the blood he saw was on the boy's face and on the ground where the body was lying.
Several witnesses for the State testified that when they saw defendant at the scene of the collision, he was drunk, his nose was cut and he had blood on his face; that he was talkative, and that he was stuttering. One said that defendant told him he had drunk a beer that afternoon; and another, that he smelled intoxicating liquor on him very strongly. And there was testimony tending to show that of the two men riding with defendant, one, an old man, was drunk.
Some of the State's witnesses testified as to statements made by defendant at the scene: One, that on being asked what he was doing driving on the left side of the road, defendant said, "Capt. when I looked up I was on that motorcycle," and on the witness saying, "You didn't try to stop," he answered "No, sir." Others said the defendant stated that when he saw he was going to hit the motorcycle he covered up his face and didn't try to stop, but just let the car go as it would.
And the State's evidence further tended to show that Felix Tant, the deceased, had that Sunday afternoon traded with Theodore Medlin, giving an automobile for the motorcycle; and that when the papers were fixed up, Tant got on the motorcycle and rode west from the store. In the language of Medlin "he rode off . . . riding as good as I could ride it," — and that in 10 or 15 minutes he heard that Tant was dead. And there was evidence that Tant was not drinking.
On the other hand, defendant offered testimony tending positively to show: (1) That Felix Tant was drunk when he got on the motorcycle at Polly's Kitchen and started off on what proved to be the fatal ride for him; and that as he rode along the highway he was driving fast, the motorcycle wobbling from one side to the other, just before it went over the hill and the crash was heard by one it had passed; and (2) that defendant and his wife and three children had gone to church in the morning, and stayed for the afternoon session, at the opening of which defendant went up in church and put his contribution in the plate, and then went out to go to a store to get crackers for his children, and that he had not been drinking and was not drunk. *Page 378 
Defendant, as witness for himself, testifying as to event leading up to the collision, said: "Tink Hodge and Howard Harris were with me. Tink Hodge was drunk. Howard Harris had not had anything to drink. Tink Hodge was sitting next to me. Howard Harris was sitting up there on the front seat on the other side of Tink . . . I got in the car and I cranked it up, and he (Tink) opened the door and asked me where I was going, and I told him down to the store to get some crackers for my children, and he asked me to let him go down the road. I told him I could not, but he opened the door and got in the car anyway. I called Howard and told him to go with me to the store and he got in. I didn't stop at any place after I left the church until the wreck. I had not had anything at all to drink that Sunday . . . I don't know exactly what time it was when I left the church to go to the store. It was about three o'clock. I was driving about 35 miles an hour. I was on the right side . . . when the motorcycle hit me. I was not quite to the top of the hill. Mr. Tant was zigzagging across the road. I stayed on the right side of the road when I saw him coming that way. I did not pull out either way. The motorcycle was about as far as from here to the front corner of the courthouse when I first saw it. It was running as much as 70 or 80 miles an hour. I don't remember anything else that happened after it cut off my nose. I was hurt when the motorcycle struck me. It cut off my nose, a hurt on my knee, and a big bump up here on my forehead. I don't know what direction my car went after it was struck. I don't know what happened after it was hit. I don't remember talking to the officer and I don't remember talking to the colored preacher. The first I remember was next morning . . . in the bed. I don't remember anything about being sewed by Dr. Wheless . . . I didn't have time to do nothing before it hit me."
And Howard Harris, as witness for defendant, after corroborating defendant as to circumstances under which he and Tink Hodge entered defendant's automobile at the church, testified: "It was about 3 1/2 miles to Polly's Kitchen. We went in sight of Polly's Kitchen and I told Hugh to turn around and go back since there was a big crowd of white people in front of the store . . . We turned around there at Mr. Coy Richardson's. Hugh had not been drinking any kind of intoxicating liquor at that time. We had not stopped at any place and when we turned around, we come back toward New Hope. There were some stores there but they were closed and the church was beyond New Hope. Hodge was sitting on the front seat of the car between Hugh and me. We did not have any whiskey, beer or alcoholic beverage of any kind in the car. After we turned around and started up the hill, he changed gears and was driving about 35 miles an hour on the right side of the road. Just before we got to the top of the hill, the motorcycle came over the *Page 379 
hill . . . swinging, and it hit the left side of Hugh's car. The motorcycle was a distance from this seat to the door there when we first saw it. My best judgment is it was 30 to 35 feet. The motorcycle was traveling 75 miles an hour. It never slowed down before it hit the front of the car. Hugh Spivey was on his right side. I just throwed up my hand when I saw the motorcycle coming. . . I couldn't tell you what the motorcycle did then. They just went to the left side of the ditch and it come to rest there. Hugh was cut across his nose and bleeding awful bad, and a knot on the side of his head. After I got out of the car I walked away from him and he said, go tell Papa . . . He was stuttering at the time. He always stutters bad all the time. I went back to the church and told his father . . . Wasn't any time at all when I saw the motorcycle coming and the time it hit. Hugh didn't have time to pull his car out of the road before he was struck . . . He was on the right side of the road and the car and motorcycle met in the car's right side of the road . . . When it hit, they met sideways to the left, across the highway. It went to the left side when it was hit . . ."
And defendant further offered numerous witnesses who testified that he was not drinking nor drunk at the church, and numerous witnesses who testified to his good character.
The State, in rebuttal, offered as witnesses: First, the Sheriff of Franklin County, who stated that he had not known defendant until the day in question, and gave it as his opinion that defendant "was under the influence of some intoxicating drink . . . considerably under the influence." The Sheriff further testified: "I examined the highway there. The only signs I saw was on the left-hand side . . . going west . . . There was some light marks, no skid marks leading from the left side . . . off the hard surface. They were not very long. I looked for indications of the point of impact. These marks were all I could find and I could not be governed by these marks, — some broken fragments of the headlights over on the bank on the south side of the road. I would say it come out of the car. From the signs where it looked like it hit to where it stopped was around twenty to twenty five feet . . . I examined the right side of the road carefully, the north side, for some distance, and there was nothing over there that could be seen. I could not tell by the signs on the road where they actually come together, except the indications of glass and these marks . . . in my opinion. The broken glass indicated that the wreck occurred a little east of the marks on the road, — possibly 8 or 10 feet."
The second witness in rebuttal was Dr. J. B. Wheless, who testified: ". . . I saw Hugh Spivey . . . My record states I saw him at 7 p.m. I made an examination. There was some odor of alcohol on his breath. He had a lacerated nose, brush burns on his right knee and had a mild *Page 380 
concussion. I observed his actions . . . I think he was entirely oriented. I mean he was aware of his situation with reference to time, place and identity of persons . . . Concussion is jarring of the brain."
And, testimony of other witnesses in rebuttal tends to show that Felix Tant, the deceased, was not drinking intoxicating liquor at Polly's Kitchen on the day of the collision.
Verdict: Guilty of manslaughter as charged.
Judgment: Imprisonment for a period of not less than five (5) nor more than ten (10) years.
Defendant appeals therefrom and assigns error.
Is the evidence shown in the record and case on appeal here under consideration, taken in the light most favorable to the State, sufficient to support a verdict of guilty of manslaughter? While there are numerous other exceptions, this is the question on which decision here must rest. Testing the sufficiency of the evidence in the light of applicable principles of law, leads to the conclusion that the evidence is sufficient to take the case to the jury and to support the verdict rendered, and we so hold. See S. v. Cope, 204 N.C. 28, 167 S.E. 456, and the recent cases of S. v. Wooten, 228 N.C. 628, 46 S.E.2d 868, and S. v. Blankenship,229 N.C. 589, 50 S.E.2d 724, and the cases therein cited. Applicable principles of law in respect to culpable negligence are fully stated and re-stated there. Hence, elaboration here would be repetitious.
There are groups of exceptions to the charge assigned as error: One group is directed to portions of the charge in which the court was stating contentions of the State. And it does not appear that the attention of the court was called to any misstatement of contention made. Hence, these exceptions are untenable. S. v. McNair, 226 N.C. 462, 38 S.E.2d 514, and cases cited.
Another group is to portions of the charge as given, under which it is contended in the brief of appellant, that the court failed to charge the jury as required by G.S. 1-180. In this connection, it appears that there is in the record no assignment of error to the effect that the court failed to state in a plain and correct manner the evidence given in the case and to declare and explain the law arising thereon as required by G.S. 1-180. Hence, the question of failure to charge, debated in respect to portions of the charge as given, is not presented. *Page 381 
And other exceptions to the charge, as well as all other assignments of error, fail to show prejudicial error.
In conclusion, regardless of how we might or might not have been disposed to vote on the facts, had we been in the jury box, error in law is not made to appear on this appeal.
No error.